Good morning. May it please the Court, my name is Alexis Mullaney. I'm representing Tanya Huber, the plaintiff appellant in this case, in her claims arising out of Westar Foods' termination of her employment on December 26, 2019. Ms. Huber brought claims against Westar Foods alleging violation of her rights under the Family Medical Leave Act, the Americans with Disabilities Act, and the Nebraska Fair Employment Practices Act, and filed suit in Federal District Court for the District of Nebraska. Westar Foods filed a motion for summary judgment on all of Ms. Huber's claims, and the Federal District Court granted Westar's motion for summary judgment. I'm going to briefly give an overview of the facts in this case. Ms. Huber was a store manager for Westar Foods, it's actually more commonly known as Hardee's is the name of the location in Nebraska. She worked at the Elkhorn location. Ms. Huber woke up on the morning of December 20, 2019, and she has testified she felt disoriented, confused. She had gotten ready for work. She testified that she had kept looking down at her work uniform, and would then realize she needed to go to work, and she'd get to the door and forget where she was going. It turned out that Ms. Huber was having a diabetic episode. She was hypoglycemic, so Ms. Huber was able to get herself to her doctor's office. She drove herself, and ended up at the doctor's office that full day, even until after the doctor's office closed at 5.30. Her doctor would not allow her to drive home, so her then-boyfriend picked her up. She was driven home, fell asleep, and called her employer the next morning. There's testimony to suggest she called her employer prior to even getting out of bed the next morning. When Ms. Huber called her employer, her employer was angry. Witness testimony indicated that Ms. Huber's manager could be heard on the phone from the next room. She was yelling. Ms. Huber explained what had happened, and they ended the phone call. It is Westar's position that Ms. Huber's manager, and her name is Cindy Kelchin, Ms. Kelchin then called Frank Westermajor, the owner of Westar Foods, who during that call, based on Ms. Kelchin's representations, made the determination to terminate Ms. Huber's employment. I'd like to start by discussing Ms. Huber's FMLA interference claim. The district court dismissed Ms. Huber's FMLA interference claim based on Westar's argument that they made the termination decision for a reason completely unrelated to Ms. Huber's protected FMLA leave, but the completely unrelated reason is that Ms. Huber did not call in on the morning of December 20th, 2019, or December 21st, 2019. The district court also referenced Westar's good faith belief that Ms. Huber's actions had violated their attendance and punctuality policy. We believe the district court erred for a few reasons with regards to Ms. Huber's FMLA This court has found that an employer's belief or intention is irrelevant to addressing an employer's liability for FMLA interference. It doesn't matter what the employer was thinking about at the time that they violated the Family Medical Leave Act. The fact that they did not give that employee what they were entitled to, leave, means that they're liable under the FMLA. So the district court saying Westar's good faith belief sort of gets them out of liability on the FMLA interference claim is problematic given this court's previous case law. Additionally, based on this court's decision in Clinkscale v. St. Therese of New Hope, which is 701 F. 3rd 825, Ms. Huber's failure to call in the violation of the attendance policy is so closely related to the very reason why she needed leave, she could not call in because she was in the midst of a diabetic emergency, that it should not be considered as an independent reason that is wholly unrelated to her request for leave. On that point, what do the facts show about the seriousness of the emergency throughout the day? And the reason why I ask that is because the employer makes much of the fact that your client called, her then boyfriend called, called her son, and diabetic emergencies range pretty widely. And so I'm kind of wondering what your best evidence shows as to what her state of health was that day. Sure. Most of the testimony regarding Ms. Huber's state before she gets to the doctor's office actually comes from her then boyfriend, Richard Grondon, because Ms. Huber doesn't remember really anything about what happened before she got to the doctor's office and she remembers very little about what happened at all that day. We know that there was a 45-minute phone call in the morning. Again, Ms. Huber doesn't recall that. She recalls getting up, getting dressed for work, and then being very confused for a long time. And that's testimony that really can't be disputed, that Ms. Huber didn't know where she was at times, isn't sure really how she was able to get herself to the doctor's office other than knowing it was pretty close to her house. There's testimony that she made phone calls during the day. She talked to her son and she talked to her boyfriend. However, the testimony is also questionable with regards to whether she was really communicating properly with the people that she talked to. Ms. Huber's son testified that she wasn't making any sense. She was out of it. She said that she was at the hospital, even though she was at the doctor's office. There was also testimony that Ms. Huber, when she spoke with her boyfriend, she couldn't explain where she was at. She had to actually try and send him her location for him to be able to locate her. So, and she, the medical records show that she was hooked up to an IV essentially the whole day, that she was out of sorts, confused, and they kept her there even until after close to be able to give her enough medicine so that she could be stable to go home. Ms. Huber also testified that they wanted her to go to the emergency room, but she wouldn't go, and so they treated her there instead. So she was in poor shape. There's also testimony that even after she left, even after the next day when she called her employer, her condition was still not stable. Her blood sugars were fluctuating all over the place. Her boyfriend was actually taking blood sugar tests every hour or two hours, and he testified that that following day when he was doing those blood sugar readings, when her blood sugar would get really low, she would be confused. She would lose dexterity. She wouldn't be able to put her words together. So it was a pretty severe diabetic episode. If you look at the diabetic episode here as described as the ex-boyfriend and the son, it is exactly as you've described it, but there's not really any medical deposition or anything that really explains this in any great detail. Does that matter at all? I mean, because ordinarily you'd look, you'd say, well, there's a doctor's report, at least, some kind of a something the doctor puts together that says a person who suffers from this category of diabetic incident may in fact have lingering brain trauma for a couple of days. And so, I mean, I don't mean to nitpick, but I was just sort of struck as I looked through the record. I didn't see that, and maybe I missed it, but... Sure. I think partly by virtue of the fact that Ms. Huber went to her general practitioner rather than going to a hospital, the records are pretty sparse. There's not a lot of information there. And if Westar had had questions at the time that Ms. Huber, you know, explained to them what had happened or at the time she explicitly, the times, she explicitly requested leave if they had said, this doesn't seem right, what are you talking about, they had options both under the FMLA and the Americans with Disabilities Act to say, this doesn't make any sense to us, go get us more records. We need a better explanation. We don't believe that you were that sick. But they didn't exercise any of those options. They took what she said and then decided to fire her. So they rushed to termination beyond conducting an appropriate investigation, in your view? Correct, Your Honor. And based on this Court's previous decisions, that rush to termination puts the employer at risk that ultimately the employee's condition will be serious enough that it would then warrant FMLA eligibility. And so the employer that, I'm not quoting here, but precipitously fires the employee, then bears that risk that ultimately this condition will develop into something more serious. The District Court really placed its decision on this issue of Westar saying they have this completely unrelated reason for terminating Ms. Huber. But based on this Court's decision in Clinkscale where an employee had an anxiety attack while treating a patient, then the employee left the hospital where she was working to go get treatment, the employer kind of tried to make the same argument. One of their arguments was, well, it's not that she, it's not her condition that was a problem for us, it's that she left. That's a completely unrelated reason. And so we're not even talking about FMLA. We have this whole other reason. It has nothing to do with FMLA. And this Court rejected that argument, saying, well, no, the reason she left is because she had an anxiety attack, which is the condition then that makes her qualified for FMLA. Similarly here, the reason why Ms. Huber was unable to call her employer is because she was in the midst of a diabetic emergency, so therefore did not follow her employer's call-in policy. And the evidence that, you know, the ex-boyfriend's evidence is that this, on the second day at least, and even in the first day to some extent, was a waxing and waning incident that she had lucid moments and not lucid moments. Correct, Your Honor. And is there any reason during the lucid moments that she was unable to contact her employer that's in the record? Or is it just that her overall condition was such that she lacked insight? I think that is the best explanation. I think actually in Ms. Kelchins' notes, she notes that when Tanya was questioned by her in the phone call, Ms. Huber said that she was all out of sorts. She was confused. I think she actually said, you can Google it. This is a serious medical happening that occurred. And I think I'm getting into my rebuttal time, Judges, so if I could reserve my remaining time for rebuttal. You may. Thank you. Ms. Boroditsa. Good morning. May it please the Court. I'm Bonnie Boroditsa. I'm here on behalf of West Star Foods. There are two claims in the case. A claim arises under the FMLA and a claim arises under the Americans with Disabilities Act. The focus on the appeal really I think has been or will be the FMLA interference claim, so I will start there. The District Court entered summary judgment on all claims in favor of West Star Foods, and it did so appropriately, and we asked the Court to uphold that ruling. The undisputed facts here are very important. Ms. Huber had worked for West Star Foods for about a year, just about a year. During that one-year time as a general manager of its Hardee's store in Elkhorn, she had, before the December incidents, she had two violations of West Star Foods attendance policy, which were very concerning to West Star Foods. As the general manager, her primary responsibility is to get that restaurant opened for business and make sure that business is ongoing, and then manage essentially every aspect of the store. So an attendance violation by a general manager is, of course, very serious to West Star Foods because if someone who is responsible for opening the store doesn't show up without any notice or ability to West Star Foods to get that shift covered, it means that the store is not operating for business. It's not open. The general manager, when opening, would be the only person there for several hours preparing the store, getting it ready to open, and so West Star Foods understandably considered these very serious violations. In January of 2019, Tanya Huber was counseled for not following that attendance policy. The policy required that you make the call. You make the call to your manager, to your supervisor. Don't text, don't send an email, make a call. Now it may be that you reach a voice fail, you leave a message, you try to call again, you get the call back. That's what West Star Foods was looking to happen. That's what West Star expected to happen. Tanya Huber received that handbook initially, was counseled on that in January of 2019, then continued working for West Star Foods, obviously, for the rest of that year. In October of 2019, she was again counseled. She left the store, issued some texts, did not make that phone call whatsoever, and received a written disciplinary form from Cindy Kelch and the district manager saying, you know this is our policy. Tanya Huber acknowledged she knows that's the policy and that it was very important to make the call. So those two incidents happened. Then we get to the central issue of the case that happens on December 20th, 2019. Following those repeated failures to follow the call-in policy, on December 20th, 2019, Ms. Huber has what we later learned is this diabetic incident. Throughout that day, makes several phone calls. Not one or two minute phone calls. We have the phone records. Lengthy phone calls. Suppose she had been in a coma, though, and there was no ability for her to call. Would there be an FMLA interference claim? Possibly, Your Honor, and I say that because the next day, the reasons for the termination were based on that failure to call in and the determination based on what Ms. Huber reported that it was practicable for her to make that call. It was feasible, it was doable, and that's what practicable means in these circumstances. We learned through Cindy Kelch's phone call the next day that Huber had made calls and had driven herself to that clinic around the time that she should have been making a call to report her absence. The reason I ask that is because with diabetes, I've seen diabetic attacks, and these people are not of the right mind in a very serious attack. I just wonder, yes, she could have called, but it's not even clear, at least from what opposing counsel said, that she would have been articulate in any way. She might have been thinking she was talking to her son or something. I mean, I just, it's hard to separate those two things, I guess. I understand the concern, Your Honor, but we have to look so specifically at the facts here that are undisputed. When we look at those phone records and we look at Ms. Huber's testimony, she cannot get away from the fact that at the time on December 19th, when she was supposed to be getting dressed, going to the restaurant to open it, she was on a 7-minute call, then a 9-minute call, then a 45-minute call with her boyfriend, Richard Grondin. And in his deposition, when I asked him about that, he doesn't remember anything out of the ordinary about that call. They had usual, customary calls when she was getting ready for work that early in the morning, and nothing stands out to him. He doesn't say she was out of it, she was, you know, she was sick. I remember she was trying to figure out what to do. Nothing like that. He doesn't have any recollection of anything out of the ordinary with that call. It's not until later when he picks her up in the evening that he talks about her being sedated because he had to go get her anti-nausea medicine, and then she was sedated in the evening and slept really hard, I think, that night. Do you think it's reasonable, and I suspect you think it is, but I just want to ask the question anyways, which is, do you think it's reasonable for an employee to have, let's say, let's presume it's a severe diabetic attack, and think to themselves, oh my gosh, I've got to call my employer immediately. I don't need to call my family necessarily. I've got to call my employer because I'm going to be late to work. The facts are very important here, and given those calls and the fact that she was having these lengthy phone calls with someone else, she also was on the phone with her son throughout that day, shows here it was reasonable to expect that. To expect one phone call, leave a voice message, or have a one minute call with someone at the restaurant just to let them know. Is that an undisputed fact, though? I mean, is that something the jury should decide, is whether it was reasonable for her not to make those calls? No, Your Honor. The facts here are undisputed on the occurrence of those calls, the length of those calls, that nothing out of the— But you have the fact that she says, and her boyfriend corroborates, that she wasn't making any sense. She may have made calls, but they weren't making any sense. Well, from time to time is what Mr. Grondin testified, that there were lucid moments and that there were non-lucid moments. So in the lucid moment, you know, that's when you think and make the call. If you're lucid, you can do so. And what do we make of the fact that there's—if you take the evidence and the like most favorable to the plaintiff, that Westar gave a false reason for termination in that they said that they did not know she was diabetic before the termination. And I don't know where you—how you can say that when the notes from the phone call says she told him she was diabetic, putting aside all the other evidence where she said she had told him before that. But even putting that aside, at least in that phone call she told him he was diabetic, but they persist in saying, well, we never knew it. The testimony from Cindy Kelchin at her deposition was she didn't know she was diabetic or had diabetes. In Cindy Kelchin's notes of the phone calls that happened the day after and the few days after, she refers to Tanya mentioning a diabetic. And the notes are—I mean, a diabetic. So of course we have to acknowledge that that word is there and it was written by Cindy Kelchin. As Judge Strasz, I think, was alluding to, there are different ways in which a diabetic incident or whatever it is might manifest. The doctor's note that Tanya Huber sent that December 21st—that's the day after the incident—to Cindy Kelchin doesn't say she had a diabetic incident, doesn't reference diabetes. It says she has been ill. It's an excuse from work note for illness. So that's what we're learning from the doctor on the day after. So there are different levels of diabetic, I think, to Cindy Kelchin. And so to Westar then, it's she's ill. You know, the interesting thing about that is if you read Ms. Huber's deposition, she doesn't come across as an extremely sophisticated person. And there seems to be some imprecision in her testimony as she gives it, right? Which is what you kind of expect with people with certain backgrounds and experiences. And so what you end up with is a note from a general practitioner that says she was sick. It kind of would lead one to believe that the inference in the most favorable to the plaintiff would be that she said, I need something from my doctor to say I was too sick to work. The doctor thinks I'm just writing your usual and customary sick note, which they write for school kids and people skipping tests on a regular basis, right? And so he writes the little one-note thing and they send it off, right? And then there's no follow-up at all. Well, what exactly was this medical condition? Because my question really is, is that once the medical condition is raised, the plaintiff is arguing that once you sort of make a prompt decision to terminate without further investigation, it takes your chances. Why is that argument wrong if we're looking at all the facts in a light most favorable to Ms. Huber and the inferences that may be reasonably drawn? Well, Your Honor, the reason that the termination decision was appropriate is an FMLA wasn't implicated at all from Westar's perspective was because the notice of any need or any reference to FMLA was not made as soon as practicable. And so we would return to the regulation that speaks to what happens when you have an unforeseeable leave. And it says that an employee is obligated to give notice of that as soon as practicable. And the regulations don't define practicable, but an ordinary dictionary definition would be, is it doable? Is it feasible? And we have a clique scale kicking around out there that talks about a person who is suffering from a mental malady such that they're unable to, that that's enough. And I think that this looks an awful lot like that. This person's in and out of lucidity. You've got a question of what's their insight? What are they able to report? And there's just, you know, and maybe I'm just looking at it with hindsight, but it seems like clink scale would be controlling. Well, I understand, Your Honor. I think the important thing to keep in mind with the cases that have been cited by the parties is that there was notice before the emergency of FMLA or of a serious medical condition. Here, I do believe it is undisputed that, at least until this serious incident happened, that West Star Foods was not aware of diabetes or that there was a serious medical condition. And it is absolutely undisputed that there was no prior FMLA leave taken. Well, isn't there a disputed fact that she says she told him that she was diabetic and was asking for accommodations to store her insulin? I know that West Star denies that, but isn't that a disputed material fact? And that relates to her ADA claim, and Ms. Huber is the only one testifying that that happened. But again, I go back to Judge Strauss' point. The diabetic can or cannot be a serious medical condition or, you know, it kind of depends on the circumstances of it. Here, we learn after the fact. It manifested on December 19th, excuse me, December 20th and December 21st in a serious way. But prior to that, West Star Foods had no information to suggest that there were serious emergencies going on with diabetes for Ms. Huber. I don't recall. Is there any evidence in the record that Ms. Huber suffered from a hypoglycemic attack before this one that resulted in her, you know, hospitalization or medical intervention? No, Your Honor. There's no evidence of that in the record. In fact, we asked her at her first incident. She was diagnosed maybe in the spring of 2019, and then this is the first serious incident that occurred. And there's obviously more than simply the evidence that she was looking for a place to store her insulin, right? Because there's, I'm looking for a place to store my insulin. The insulin then got stored in the store safe and presumably somebody's got access to that safe and if you start seeing insulin syringes in there, that might seem unusual. And then the third thing is you've got the, gosh now I'm drawing a blank, but there's a third thing. What is it? Oh, that she was sometimes under such intense pressure at work that she was unable to find a time to eat and that as a diabetic, it was causing her blood sugar levels to spike and trough. And all of that, we have to assume is true at this stage, right? Correct, Your Honor. Okay. And she says that she communicated those to Ms. Kelchin. Isn't that enough to create this question of fact that going forward? I don't believe so, Your Honor. So again, I think you've basically laid out the bare bones facts that would be taken in the light most favorable to Ms. Huber. But when we get to the December 20th incident, no prior FMLA had been requested. When Ms. Kelchin first learns about it the following day, she only knows diabetic is mentioned. And she receives a doctor's note that says, please excuse Ms. Huber due to illness. And so, you know, West Star Foods looks at that information when it receives it after having spent the day before not hearing whatsoever from Ms. Huber. But then learning that she drove herself to the clinic, you know, we've learned through discovery, of course, that all of those phone calls were made. And then we have the prior discipline. But they didn't know about the phone calls when they made the decision to terminate her, right? I think that is correct, Your Honor. That has come out in discovery. But at the exact time that Ms. Huber should have been reporting to work or if she couldn't report calling in to Ms. Kelchin, she was driving herself to a clinic. Simply ask that notice be provided as soon as it was doable to do so. And if someone's lucid enough to drive and get to the clinic, get yourself admitted to the clinic, just make that quick phone call. And so, we believe that the district court properly interpreted those facts, found them undisputed, and would ask for that to be upheld. Thank you, Your Honors. Ms. Mullaney, your rebuttal. Your Honors, I'd like to briefly address the ADA claim because it came up a bit more during the appellee's argument than it did during mine. And that Ms. Kelchin gave this false reason. She said, I didn't even know Ms. Huber was diabetic in her deposition, whereas her notes said that Tani had told her, and this is in the appendix, volume 1, page 92, that her levels of her diabetic was off. I think that creates a jury question as to whether Ms. Kelchin did know that Ms. Huber was diabetic prior to terminating Ms. Huber. Then it raises the question, well, why did she lie about that? And this kind of dovetails into the ADA argument where the district court really only looked at discriminatory animus from Frank Westermajer, which is really the problem with that decision. Frank Westermajer relied almost entirely on input from Cindy Kelchin. And so, even though he, you know, put the rubber stamp on the termination, he effectively delegated that power to her. So, Ms. Kelchin's testimony to Mr. Westermajer. Can I ask you about the insulin? So, somebody who's familiar with diabetes would know that if you have, if you need to take insulin, that that's a serious form of diabetes. You could die if your levels get off. But do we think that the average person, I mean, you have the other evidence too, but the insulin alone, do you think the average person necessarily knows if somebody's taking insulin that this is a very serious condition? I'm just thinking about the type where you don't have to take insulin, where you may just need to lay down or eat a cracker or eat some sugar or whatever. I just want to sort of explore that with you a little bit. I think the average person would know that insulin is needed to treat serious diabetes, right? I mean, you're having to inject sugar into your blood just to stay conscious and not go into a coma or have serious health consequences. And diabetes is a relatively common thing. Most of us know somebody who has diabetes, even serious diabetes, and has to take those blood sugar measurements, has to take insulin. So I think, again, that raises a question for the jury to decide. Why did she lie about this? And did she really not know that Ms. Huber had diabetes, even though she's requesting insulin be stored at a certain temperature? She's saying my levels of diabetic are off. Can Ms. Kelchin's statement that she wasn't aware really be taken seriously? And then does that create a credibility question? We think it does. And, Your Honor, for those reasons, or Your Honors, for those reasons, we would respectfully request that this Court reverse and remand the District Court's decision with regards to Ms. Huber's FMLA interference and ADA discrimination claims so that this matter can be tried to a jury. Thank you very much.